Julius Callner and Sarah Callner v. Commissioner. Morris J. Okrent and Esta Okrent v. Commissioner. Abner E. Kops v. Commissioner.
Callner v. Commissioner
Docket Nos. 67947, 67968, 67969.
United States Tax Court
T.C. Memo 1960-82; 1960 Tax Ct. Memo LEXIS 206; 19 T.C.M. (CCH) 435; T.C.M. (RIA) 60082; April 29, 1960
*206 Richard D. Hobbet, Esq., for the petitioners. James T. Wilkes, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of the petitioners for the taxable year 1950 in the amounts as follows: Julius Callner, Sarah Callner
$20,778.28
Morris J. Okrent, Esta Okrent
20,467.30
Abner E. Kops
26,368.84
The issues for determination are whether the respondent erred in determining that during 1950 petitioners received a dividend from a corporation of which they were the sole stockholders by reason of a distribution by the corporation to them of real estate and whether the assessment of the deficiencies is barred by the expiration of the period of limitations. Findings of Fact All stipulated facts are found. Julius Callner and Sarah Callner are husband and wife and Morris J. Okrent and Esta Okrent are husband and wife, both of which couples filed joint Federal income tax returns for the taxable year 1950 with the district director at Milwaukee, Wisconsin. Abner E. Kops is a single man who also filed his Federal income tax return for that year with *207 the director at Milwaukee, Wisconsin. Petitioner or petitioners as hereinafter used has reference to the husbands and petitioner Kops. Prior to June 27, 1945, petitioners had determined to enter into business in association with each other as retail lumber dealers. Their available cash for so doing was sufficient only to make a down payment upon the land and buildings to be used for the business and to purchase necessary operating equipment. No cash was available for continued operation after initial outlays for those purposes. On June 27, 1945, petitioners jointly contracted with the owners of property in the city of Milwaukee, Wisconsin, for the purchase of such property for the conduct of their business, the address thereof being 400 West Capitol Drive, Milwaukee, Wisconsin. The contract called for a down payment of $11,000, which was paid by petitioners upon execution thereof, and the additional payment of $34,500, payable $2,500 on each succeeding first day of July and January thereafter until the entire balance, plus 4 per cent interest per annum upon the average annual principal outstanding, had been paid. On December 28, 1945, petitioners formally organized a Wisconsin *208 corporation known as Capitol Lumber Company for the purpose of engaging in the lumber and building material business. However, prior thereto in July of that year, petitioners made and executed a lease of the contracted for premises, as lessors, with "Capitol Lumber Co., a Wisconsin corporation," as tenant, the lease being executed by each of the individual petitioners in their individual capacities and by petitioners Callner and Kops as president and secretary of Capitol Lumber Co., respectively. The term of the lease began with the date of its execution and extended "until the 31st day of December, 1950, or until the land contract payments hereinafter described shall be completed." The land contract referred to in the lease was the land contract mentioned above. The rentals called for by the lease were the payments due on the land contract, both principal and interest. In addition, the tenant was required to pay when due all taxes assessed against the leased premises, together with repairs and improvements made during the term thereof. The lease also contained the following provision: "It is further agreed between the parties hereto that after said land contract is fully satisfied *209 and title to the property hereinbefore described is in the Lessors [petitioners], that the Lessors shall rent and lease to the Tenant [Capitol Lumber Co.] said property for the term of five years, commencing on January 1, 1951 and ending on December 31, 1955, at rental to be agreed upon." Thereafter petitioners sought a line of credit with a Milwaukee bank, which the bank indicated to them it was unwilling to grant unless the vendees' interests in the land contract referred to were assigned to Capitol. While it was the intention of the petitioners to retain their interests in the premises purchased by them under the land contract referred to, they determined to make an assignment of their interests therein to the corporation in order that its books might indicate ownership thereof, thereby making available to the corporation the line of credit which they had sought. At a meeting held on January 3, 1946, the board of directors of Capitol, composed of the petitioners, by appropriate resolution ratified and adopted the above-mentioned lease. On the same day, January 3, 1946, and in pursuance of their prior determination the petitioners executed an assignment of their vendees' *210 interests in the land contract to Capitol, which assignment was duly recorded with the Register of Deeds of Milwaukee County, Wisconsin, on August 13, 1947. Their purpose in so doing was to loan the property to Capitol for credit purposes and not to convey title to an interest in the land contract. Although petitioners were individually skilled in the conduct of a lumber and building material business, they had no knowledge concerning bookkeeping and accountancy and therefore engaged the services of an accountant to establish a bookkeeping system for Capitol and thereafter maintain its books of account. The opening entry in the journal of the books of Capitol prepared by the accountant indicated that Capitol owned the land here involved, valued at $41,000, and the buildings constructed thereon, valued at $14,000, that there was a land contract payable by Capitol of $34,500 and common stock of $20,500. The business continued to be conducted by Capitol for the years 1946 through 1950 and during those years Capitol paid as rent required by the lease the entire amount owed under the land contract, plus premiums on fire insurance policies covering the property. The principal amount *211 of $34,500 owing under the land contract was paid by Capitol during the following years in the indicated amounts: 1946
$ 7,500
1947
10,000
1948
5,000
1949
5,000
1950
7,000 After the payments called for by the land contract had been completed the vendors thereunder, on December 11, 1950, executed and delivered to the individual petitioners jointly a deed to a 292/350ths interest in and to the land and premises described in the land contract above referred to. [1]
Subsequent to the execution and delivery of the deed to them, and on January 2, 1951, the petitioners, through Calnorab Company, a partnership consisting of petitioners, entered into a new lease with Capitol whereby they leased the property to Capitol for a further term ending December 31, 1955. Following the execution of the lease *212 and the payment of rentals thereunder, Capitol's accountant in working with its books discovered for the first time any indication that Capitol was making rental payments for the use of the business premises it occupied. After a discussion with the petitioners, during which the facts set forth above were disclosed to him, the accountant under date of December 31, 1951 made the following reversing entries upon Capitol's books: Reserve for Depreciation, build-
ing
$ 3,080
Loan Receivable (Calnorab Co.)
34,500
Capital Stock
17,420
Land
$41,000
Building
14,000
In their individual income tax returns for the years 1946 through 1950 petitioners did not report as income to them any portion of the payments made by Capitol upon the land contract referred to, nor did petitioners deduct in their returns depreciation upon the premises here involved. On the other hand, for such years, Capitol took as a deduction depreciation on such premises on the basis of a 25-year estimated life but did not deduct as rentals or otherwise the payments it made under its lease with petitioners. In determining the deficiencies in question the respondent determined that the fair *213 market value of the real property occupied by Capitol and used in its business was $185,000 on December 11, 1950; that on that date Capitol distributed one-third of the property to each of the petitioners; that one-third of the amount of such fair market value of $185,000, as limited by onethird of Capitol's accumulated earnings and profits of $132,800.96, or $44,266.99, was taxable to each of the petitioners as ordinary income. Inasmuch as none of the petitioners reported the $44,266.99, or any portion thereof as income for 1950, the respondent increased the income of each by $44,266.99. During the taxable year 1950 Capitol did not distribute to the petitioners the land and buildings occupied and used by it for business purposes. On or before March 15, 1951, each of the petitioners filed his income tax return for 1950. The gross incomes stated in the returns of the respective petitioners were as follows: Julius Callner
$20,400.00
Morris J. Okrent
20,400.00
Abner E. Kops
21,492.47
On the following dates the respective petitioners executed a consent in writing to the extension of the period of limitations on the assessment and collection of income taxes for *214 1950 to any time on or before June 30, 1956, provided the provisions of section 275(c) of the Internal Revenue Code of 1939 are applicable: Julius Callner
November 18, 1955
Morris J. Okrent
November 18, 1955
Abner E. Kops
April 18, 1955
Thereafter and on April 25, 1956, each of the respective petitioners executed an additional consent in writing to the extension of the period of limitations on the assessment and collection of income taxes for 1950 to any time on or before June 30, 1957, provided the provisions of section 275(c) of the Code are applicable. The notices of the deficiencies involved herein were sent by the respondent to the respective petitioners on March 19, 1957. Opinion As pointed out by the Supreme Court in Colony, Inc. v. Commissioner, 357 U.S. 28, under the Internal Revenue Code of 1939 the general statute of limitations governing the assessment of deficiencies in Federal income tax is 3 years from the date on which the taxpayer filed his return. A special 5-year period of limitations is provided when a taxpayer "omits from gross income an amount properly includible therein which is in excess of 25 per cent of the amount *215 of gross income stated in the return." In either case the period of limitations may be extended by a consent in writing executed by the taxpayer within the statutory or any extended period of limitations. Where, as here, the respondent relies on the special 5-year period of limitations, he has the burden of proving that the taxpayer omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return. Estate of James F. Suter, 29 T.C. 244; W. H. Truschel, 29 T.C. 433. The respondent's determination that the taxpayer so omitted such an amount of income does not carry with it a presumption of correctness and may not be used as a substitute for the evidence required of him to discharge his burden. Lois Seltzer, 21 T.C. 398. The respondent takes the position that by their assignment on January 3, 1946, of the land contract to Capitol the petitioners intended thereby to and did part with all their rights and interests under such contract; that by Capitol thereafter and prior to December 11, 1950, having paid the remaining amount owing under the contract, $34,500, *216 Capitol, and not petitioners, was entitled to have executed to it the deed issued by the vendors of the property to the petitioners on December 11, 1950; that by petitioners, who were in control of Capitol having caused the deed to be executed to themselves, there was in substance a distribution of the property by Capitol to petitioners; and that accordingly the petitioners received a dividend to the extent of the fair market value of the property on December 11, 1950, $148,500, as limited by Capitol's accumulated earnings and profits, $132,800.96, or a dividend to each petitioner of one-third of the latter amount, or $44,266.99. In view of the foregoing position of respondent the primary question for determination is whether by their assignment on January 3, 1946, of the land contract to Capitol, the petitioners intended thereby to and did part with all their rights and interests under such contract. The petitioners urge that they did not so intend and further that under no arrangement entered into by them did Capitol ever become entitled to or did it ever acquire any interest in the land contract or the property covered by that contract. Our finding that the purpose of the petitioners *217 in executing the assignment in question was to loan the property to Capitol for credit purposes and not to convey title to an interest in the land contract disposes of the question adversely to the respondent. In making such finding we have carefully considered all of the evidence bearing on the matter, including an affidavit of petitioner Abner E. Kops which respondent placed in evidence and which contains the following: "On January 3, 1946, an assignment of the hereinbefore referred to land contract was made to the Capitol Lumber Company. This assignment was made at the specific request of the Northern State Bank, Milwaukee, the bank at which said Capitol Lumber Company was establishing a line of credit. It was definitely agreed and understood, however, by all of the parties that the assignment was temporary in nature. This expedient was used solely to subordinate the claims of the individuals in the land contract, who also were the principal stockholders of Capitol Lumber Company, to the claim of the bank. Title to the real estate was in no way affected, and the title was to remain in the names of the individuals. As further evidence of this intention is the fact that upon completion *218 of the payments under the land contract in December of 1950, title to the real property in question was taken in the name of the taxpayer, Julius Callner and Morris J. Okrent, at which time the taxpayer acquired a one-third undivided interest in the real estate as provided for in the original land contract." It is true that during the years 1946 through 1950 Capitol paid to the vendors under the land contract the entire remaining amount owed under that contract, including principal in the amount of $34,500. But such payments were made as rent required by the lease between petitioners and Capitol and not for the purpose of Capitol acquiring an interest in the land contract or the property covered by such contract. From our consideration of the record we are of the opinion that when on December 11, 1950, the petitioners received from the vendors under the land contract a deed to the property in question, they received it pursuant to the terms of that contract and as the sole and only parties having any interest in the property and as the only parties entitled to a deed thereto. Such being the situation we can not find that the property, or any interest therein, was received by petitioners *219 as a distribution from Capitol. Accordingly the respondent's contention that in 1950 each of the petitioners received a dividend of $44,266.99 on account of the property is denied. Since the payments made by Capitol to the vendors under the land contract were made as rent required by the lease between Capitol and the petitioners, they constituted rental income to the petitioners in equal amounts for the years in which they were made. The only amount shown by the evidence as having been paid by Capitol during 1950, the only year before us, to the vendors under the land contract is $7,000. One-third of that amount, or $2,333.33, the amount allocable to each of the petitioners, is considerably less than 25 per cent of the amounts of gross income stated by petitioners in their respective income tax returns for 1950. In view of this we conclude that the respondent has failed to discharge his burden of proving that the petitioners omitted from gross income for 1950 an amount properly includible therein which is in excess of 25 per cent of the amounts of gross income stated in their respective income tax returns for that year. As a consequence we hold that the special 5-year period of limitations *220 for making assessment of deficiencies is not applicable here. Since the consents to the extension of the period of limitations executed by the petitioners are conditioned upon the 5-year period of limitations being applicable and since we have concluded above that it is inapplicable, we hold that the general 3-year period of limitations has expired for making assessment against the petitioners of the tax on their proportional parts of the above-mentioned $7,000 of rental income for 1950. Decisions will be entered for the petitioners. Footnotes
1. Although the land contract calls for a warranty deed of the entire premises in fee simple, no explanation is given in the record with respect to the 58/350ths interest not covered by the executors' deed referred to. An executors' deed was given rather than a warranty deed for the reason that one of the vendors was at the time of the execution of the deed deceased.↩