Justice Scalia,
concurring in part and concurring in the judgment.
It would be reasonable, I think, to deny all precedential effect to Colony, Inc. v. Commissioner, 357 U. S. 28 (1958)— to overrule its holding as obviously contrary to our later law that agency resolutions of ambiguities are to be accorded deference. Because of justifiable taxpayer reliance I would not take that course — and neither does the Court’s opinion, which says that “Colony determines the outcome in this case.” Ante, at 483. That should be the end of the matter.
The plurality, however, goes on to address the Government’s argument that Treasury Regulation § 301.6501(e)-l effectively overturned Colony. See 26 CFR § 301.6501(e)-l (2011). In my view, that cannot be: “Once a court has de *493 cided upon its de novo construction of the statute, there no longer is a different construction that is consistent with the court’s holding and available for adoption by the agency.” National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 1018, n. 12 (2005) (Scalia, J., dissenting) (citation and internal quotation marks omitted). That view, of course, did not carry the day in Brand X, and the Government quite reasonably relies on the Brand X majority’s innovative pronouncement that a "court’s prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute.” Id., at 982.
In cases decided pr e-Brand X, the Court had no inkling that it must utter the magic words “ambiguous” or “unambiguous” in order to (poof!) expand or abridge executive power, and (poof!) enable or disable administrative contradiction of the Supreme Court. Indeed, the Court was unaware of even the utility (much less the necessity) of making the ambiguous/nonambiguous determination in cases decided pre-Chevron, before that opinion made the so-called “Step 1” determination of ambiguity vel non a customary (though hardly mandatory[1]) part of judicial-review analysis, see Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984). For many of those earlier cases, therefore, it will be incredibly difficult to determine *494 whether the decision purported to be giving meaning to an ambiguous, or rather an unambiguous, statute.
Thus, one would have thought that the Brand X majority would breathe a sigh of relief in the present case, involving a pre-Chevron opinion that (mirabile dictu) makes it inescapably clear that the Court thought the statute ambiguous: “[I]t cannot be said that the language is unambiguous” Colony, supra, at 33 (emphasis added). As today’s plurality opinion explains, Colony “said that the taxpayer had the better side of the textual argument,” ante, at 489 (emphasis added) — not what Brand X requires to foreclose administrative revision of our decisions: “the only permissible reading of the statute,” 545 U. S., at 984. Thus, having decided to stand by Colony and to stand by Brand X as well, the plurality should have found — in order to reach the decision it did— that the Treasury . Department’s current interpretation was unreasonable.
Instead of doing what Brand X would require, however, the plurality manages to sustain the justifiable reliance of taxpayers by revising yet again the meaning of Chevron— and revising it yet again in a direction that will create confusion and uncertainty. See United States v. Mead Corp., 533 U. S. 218, 245-246 (2001) (Scalia, J., dissenting); Bressman, How Mead Has Muddled Judicial Review of Agency Action, 58 Vand. L. Rev. 1443, 1457-1475 (2005). Of course there is no doubt that, with regard to the Internal Revenue Code, the Treasury Department satisfies the Mead requirement of some indication “that Congress delegated authority to the agency generally to make rules carrying the force of law.” 533 U. S., at 226-227. We have given Chevron deference to a Treasury Regulation before. See Mayo Foundation for Medical Ed. and Research v. United States, 562 U. S. 44, 58 (2011). But in order to evade Brand X and yet reaffirm Colony, the plurality would add yet another lop-sided story to the ugly and improbable structure that our law of administrative review has become: To trigger the Brand X power *495 of an authorized “gap-filling” agency to give content to an ambiguous text, a pr e-Chevron determination that language is ambiguous does not alone suffice; the pr e-Chevron Court must in addition have found that Congress wanted the particular ambiguity in question to be resolved by the agency. And here, today’s plurality opinion finds, “[t]here is no reason to believe that the linguistic ambiguity noted by Colony reflects a post -Chevron conclusion that Congress had delegated gap-filling power to the agency.” Ante, at 488-489. The notion, seemingly, is that post-Chevron a finding of ambiguity is accompanied by a finding of agency authority to resolve the ambiguity, but pr e-Chevron that was not so. The premise is false. Post -Chevron cases do not “conclude” that Congress wanted the particular ambiguity resolved by the agency; that is simply the legal effect of ambiguity — a legal effect that should obtain whenever the language is in fact (as Colony found) ambiguous.
Does the plurality feel that it ought not give effect to Colony’s determination of ambiguity because the Court did not know, in that era, the importance of that determination— that it would empower the agency to (in effect) revise the Court’s determination of statutory meaning? But as I suggested earlier, that was an ignorance which all of our cases shared not just pr e-Chevron, but pr e-Brand X. Before then it did not really matter whether the Court was resolving an ambiguity or setting forth the statute’s clear meaning. The opinion might (or might not) advert to that point in the course of its analysis, but either way the Court’s interpretation of the statute would be the law. So it is no small number of still-authoritative cases that today’s plurality opinion would exile to the Land of Uncertainty.
Perhaps sensing the fragility of its new approach, the plurality opinion then pivots (as the a la mode vernacular has it) — from focusing on whether Colony concluded that there was gap-filling authority to focusing on whether Colony concluded that there was any gap to be filled: “The question is *496 whether the Court in Colony concluded that the statute left such a gap. And, in our view, the opinion . . . makes clear that it did not.” Ante, at 489-490. How does the plurality know this? Because Justice Harlan's opinion “said that the taxpayer had the better side of the textual argument”; because it found that legislative history indicated “that Congress intended overstatements of basis to fall outside the statute’s scope”; because it concluded that the Commissioner’s interpretation would “create a patent incongruity in the tax law”; and because it found its interpretation “in harmony with the [now] unambiguous language” of the 1954 Code. Ante, at 489 (internal quotation marks omitted). But these are the sorts of arguments that courts always use in resolving ambiguities. They do not prove that no ambiguity existed, unless one believes that an ambiguity resolved is.an ambiguity that never existed in the first place. Colony said unambiguously that the text was ambiguous, and that should be an end of the matter — unless one wants simply to deny stare decisis effect to Colony as a pre-Chevron decision.
Rather than making our judicial-review jurisprudence curiouser and curiouser, the Court should abandon the opinion that produces these contortions, Brand X. I join the judgment announced by the Court because it is indisputable that Colony resolved the construction of the statutory language at issue here, and that construction must therefore control. And I join the Court’s opinion except for Part IV-C.
⅜ ‡ ⅜
I must add a word about the peroration of the dissent, which asserts that “[o]ur legal system presumes there will be continuing dialogue among the three branches of Government on questions of statutory interpretation and application,” and that the “'constructive discourse,’” “‘eonver-s[ations],’ ” and “instructive exchanges” would be “foreclosed by an insistence on adhering to earlier interpretations of a statute even in light of new, relevant statutory amend- *497 merits.” Post, at 503-504 (opinion of Kennedy, J.). This passage is reminiscent of Professor K. C. Davis’s vision that administrative procedure is developed by “a partnership between legislators and judges,” who “working [as] partners produce better law than legislators alone could possibly produce.”[2] That romantic,' judge-empowering image was obliterated by this Court in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U. S. 519 (1978), which held that Congress prescribes and we obey, with no discretion to add to the administrative procedures that Congress has created. It seems to me that the dissent’s vision of a troika partnership (legislative-exeeutive-judicial) is a similar mirage. The discourse, conversation, and exchange that the dissent perceives is peculiarly one-sided. Congress prescribes; and where Congress’s prescription is ambiguous the Executive can (within the scope of the ambiguity) clarify that prescription; and if the product is constitutional the courts obey. I hardly think it amounts to a “discourse” that Congress or (as this Court would allow in its Brand X decision) the Executive can change its prescription so as to render our prior holding irrelevant. What is needed for the system to work is that Congress, the Executive, and the private parties subject to their dispositions, be able to predict the meaning that the courts will give to their instructions. That goal would be obstructed if the judicially established meaning of a technical legal term used in a very specific context could be overturned on the basis of statutory indications as feeble as those asserted here.

“Step 1” has never been an essential part of Chevron analysis. Whether a particular statute is ambiguous makes no difference if the interpretation adopted by the agency is clearly reasonable — and it would be a waste of time to conduct that inquiry. See Entergy Corp. v. Riverkeeper, Inc., 556 U. S. 208, 218, and n. 4 (2009). The same would be true if the agency interpretation is clearly beyond the scope of any conceivable ambiguity. It does not matter whether the word “yellow” is ambiguous when the agency has interpreted it to mean “purple.” See Stephenson & Vermeule, Chevron Has Only One Step, 95 Va. L. Rev. 597, 599 (2009).

 1 K. Davis, Administrative Law Treatise § 2.17, p. 138 (2d ed. 1978).